Mark K. Schonfeld
Regional Director (MS-2798)

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 437
New York, New York 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAR 18 2008
U.S.D.C. S.D. N.Y.
CASHIERS



JUDGE RAKOFF

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

W. P. CAREY & CO. LLC, CAREY FINANCIAL
LLC, JOHN J. PARK, AND CLAUDE
FERNANDEZ,

Defendants.

---

08 No. CV 2846

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants W.P. Carey & Co. LLC ("WPC"), Carey Financial LLC ("CF"), John J. Park

("Park"), and Claude Fernandez ("Fernandez") (collectively, "Defendants"):

## SUMMARY

1.      WPC creates and manages real estate investment trusts ("REITs") – known as the

"CPA REITs" – investment vehicles that pool money from investors to purchase portfolios of

real estate.  Investors in REITs receive dividends from the income earned on the real estate

portfolio.  CF is a broker-dealer subsidiary of WPC that acts as a wholesaler of the CPA REITs.

The CPA REITs do not trade on any exchange, but rather are sold to investors by select retail broker-dealers whose financial advisers typically initiate the sales contact with investors. Thus, maintaining the selling relationship with a retail broker-dealer is necessary to WPC's ability to sell the CPA REITs.

2.     This case concerns a number of securities law violations by WPC and CF, including paying nearly $10 million in undisclosed compensation to a broker-dealer that sold the CPA REITs, paying undisclosed compensation to another broker-dealer for proxy solicitation services, conducting an unregistered offering of certain CPA REITs, and other disclosure failures.

Undisclosed Broker-Dealer Compensation

3.     The offering prospectuses for REITs are required to disclose to investors the compensation the REITs pay to broker-dealers who sell the REITs. In addition, the rules of the National Association of Securities Dealers ("NASD," now known as the Financial Industry Regulatory Authority), limit the compensation that may be paid to broker-dealers who sell non-traded REITs to 10 percent of the total proceeds raised (the "10 percent cap"), plus an additional 0.5 percent for reimbursement of bona fide due diligence expenses.

4.     From 2000 to 2003, WPC caused the CPA REITs to pay nearly $10 million in undisclosed compensation to one of its selling broker-dealers ("Broker-Dealer A") to maintain Broker-Dealer A as a seller of current and future CPA REITs. Broker-Dealer A, the largest seller of the CPA REITs, demanded the additional compensation, which it referred to as "revenue sharing," in addition to the compensation that was disclosed in the CPA REITs' offering documents.

5.     WPC did not disclose the payment of the additional compensation in the CPA

2

REITs' offering documents or periodic filings with the Commission. The undisclosed payments exceeded the 10 percent caps on broker-dealer compensation. In order to conceal the payments and circumvent the 10 percent cap, WPC requested sham invoices from Broker-Dealer A – including invoices for "account maintenance," "field access," "due diligence," and "conference fees" – as a means for WPC to pay the additional compensation to Broker-Dealer A. The total of payments made each year under all labels equaled the amount of additional compensation, or revenue sharing, WPC agreed to pay Broker-Dealer A. In addition, by exceeding the 10 percent cap, WPC collected higher fees from the CPA REITs through its wholesaling broker, CF.

6.     Park, WPC's former chief financial officer ("CFO"), orchestrated the revenue sharing arrangements with Broker-Dealer A, with assistance from Fernandez, WPC's former chief accounting officer ("CAO"). Park and Fernandez prepared or signed offering documents and periodic reports filed with the Commission that failed to disclose the revenue sharing payments. Park directed the preparation of invoices and approved payment of invoices that misrepresented the nature of the payments in order to conceal the undisclosed compensation. Fernandez participated in processing these payments and the exclusion of these payments from the 10 per cent cap.

Undisclosed Payment for Proxy Solicitation Services

7.     In 2002, WPC proposed to merge two of its CPA REITs, subject to approval by the REITs' shareholders. WPC caused the REITs to pay $100,000 to a broker-dealer ("Broker-Dealer B"), which had sold the REITs to investors, to solicit shareholder votes in favor of the merger. In the registration statement and proxy materials for the merger, WPC failed to disclose the $100,000 payment for proxy solicitation services to Broker-Dealer B. Park authorized this payment to Broker-Dealer B.

3

Unregistered Offering

8.    WPC and CF offered and sold more than $235 million of one of the CPA REIT's

shares without a registration statement in effect, in violation of the registration provisions of the

federal securities laws. In 2002 and 2003, after the REIT had sold out its first offering and the

second offering of that REIT was in registration but not yet effective, CF and its network of retail

distributors continued to sell shares of that REIT for five months and accept investor funds into

escrow.

Other Disclosure Failures

9.    WPC also failed to comply with other disclosure requirements. In filings with the

Commission, WPC failed to disclose the bankruptcy of a company at which a WPC senior

executive was previously the CFO, even though the senior executive's prior service as CFO of

that company was discussed in numerous filings.

10.    In addition, prior to 2004, the majority of executive officers and directors of the

CPA REITs failed to file forms required under Section 16(a) of the Securities Exchange Act of

1934 ("Exchange Act"), and the CPA REITs' annual proxy statements and annual reports falsely

stated there were no Section 16(a) delinquent filings.

Violations

11.    By virtue of the conduct alleged herein:

a.    WPC, directly or indirectly, singly or in concert, has engaged in acts,

practices and courses of business that constitute violations of Sections 5(a) and 17(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77q(a)] and Sections 10(b),

13(a), 13(b)(2)(A), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A),

and 78n(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 14a-9 thereunder [17 C.F.R. §§

240.10b-5, 240.13a-1, 240.13a-13, and 240.14a-9];

        b.     CF, directly or indirectly, singly or in concert, has engaged in acts,

practices and courses of business that constitute violations of Section 5(a) of the Securities Act

[15 U.S.C. § 77e(a)];

        c.     Park, directly or indirectly, singly or in concert, has engaged in acts,

practices and courses of business that constitute violations of Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)] and Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act [15 U.S.C. §§

78j(b), 78m(b)(5), and 78n(a)] and Rules 10b-5, 13a-14, 13b2-1, and 14a-9 promulgated

thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.14a-9]; and pursuant to

Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Park is also liable for aiding and abetting

WPC's violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and

78m(b)(2)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and

240.13a-13]; and

        d.     Fernandez, directly or indirectly, singly or in concert, has engaged in acts,

practices and courses of business that constitute violations of Sections 17(a)(2) and 17(a)(3) of

the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] and Section 13(b)(5) of the Exchange

Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 promulgated thereunder [17 C.F.R. § 240.13b2-

1]; and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Fernandez is also

liable for aiding and abetting WPC's violations of Sections 13(a) and 13(b)(2) of the Exchange

Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§

240.12b-20, 240.13a-1, and 240.13a-13].

## JURISDICTION AND VENUE

      12.     The Commission brings this action pursuant to Section 20(b) of the Securities Act

[15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13.    This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

14.    Venue is proper in this district court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices and courses of conduct alleged herein, which constitute violations of the Securities Act and Exchange Act, occurred within the Southern District of New York, including, but not limited to, conduct by the Defendants while at WPC's and CF's offices in New York, New York.

15.    Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged herein.

## THE DEFENDANTS

16.    **WPC** is a Delaware limited liability company with its principal place of business in New York, New York.  WPC is a real estate investment and advisory company.  At all relevant times, WPC's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the symbol "WPC."  WPC directly, and through its wholly owned subsidiary, Carey Asset Management Corp. ("CAM") creates, manages, and acts as an advisor to, the CPA REITs, a series of non-traded REITs.

17.    **CF**, a wholly owned subsidiary of CAM and an indirect wholly owned subsidiary of WPC through CAM, is a Delaware limited liability company with its principal place of business in New York, New York.  At all relevant times, CF was a broker-dealer registered with

the Commission and a NASD member broker-dealer, which registration and membership remain currently in effect.  CF acted as a wholesaler or selling agent for the CPA REITs, using a network of retail broker-dealers to sell shares of CPA REITs to investors.

18.    **Park**, age 44, resides in Short Hills, New Jersey.  From approximately 1999 until May 4, 2005, Park was CFO of WPC and of the CPA REITs in existence throughout that time period.  Park, until his resignation yesterday, served as managing director of strategic planning of WPC and of the CPA REITs in existence.  Park is currently an employee in charge of strategic planning at a WPC subsidiary.

19.    **Fernandez**, age 55, resides in West Harrison, New York.  Since approximately 1997, Fernandez has served as a managing director of WPC and of the CPA REITs in existence throughout that time period.  Fernandez served as chief accounting and/or chief administrative officer of WPC and of the CPA REITs in existence from approximately 1997 until June 14, 2007.  Fernandez is a certified public accountant licensed in New York.

## RELEVANT ENTITIES

20.    **The CPA REITs** were created by WPC as a series of non-traded REITs whose shares were successively publicly offered during the following years: Corporate Property Associates ("CPA") 10 (1990-91); Carey Institutional Properties ("CIP") (1991-93); CPA:12 (1994-97); CPA:14 (1997-2001); and CPA:15 (2001-03).  In 2002, CPA:10 merged into CIP and in 2004, CIP merged into CPA:15.  In 2006, CPA:12 merged into CPA:14.  The CPA REITs have no employees and their executive officers hold parallel positions at WPC and CAM.  WPC directly and through CAM receives asset management fees and transaction structuring fees from the CPA REITs for providing day-to-day management, advisory, and transaction-related services for the CPA REITs.

## FACTS

### A.    Undisclosed Revenue Sharing Payments

21.    In early 2000, WPC, at the request of Broker-Dealer A, entered into an agreement with Broker-Dealer A to pay supplementary and undisclosed remuneration in addition to the compensation Broker-Dealer A was entitled to receive under its distribution agreements with CF and the CPA REITs (the "revenue sharing arrangement"). WPC entered into this revenue sharing arrangement in an effort to maintain Broker-Dealer A as a seller for current and future offerings of WPC's series of CPA REITs. The revenue sharing arrangement was modified in both 2001 and 2002 to increase the amount of additional compensation received by Broker-Dealer A. In total, Broker-Dealer A received approximately $9.7 million under this undisclosed revenue sharing arrangement.

22.    Between early 2000 and mid-2002, Broker-Dealer A was responsible for approximately 90 percent of the shares of the CPA REIT product being sold. WPC benefited from the revenue sharing arrangement with Broker-Dealer A because Broker-Dealer A's sales of CPA REIT shares increased the management fees that WPC received directly and through its wholly owned subsidiary, CAM. WPC also benefited because CF received sales fees on shares of CPA REITs sold by Broker-Dealer A.

23.    Although WPC received the benefits of the revenue sharing arrangement, WPC paid for this arrangement by using over $9.7 million of the CPA REITs' cash assets to pay for the revenue sharing arrangement that WPC had entered into with Broker-Dealer A between early 2000 and December 2003 (the "Relevant Period").

24.    WPC caused the two CPA REITs, CPA:14 and CPA:15, that were publicly offered during the Relevant Period to make material misrepresentations and to omit to state

8

material facts in their offering documents by failing to disclose WPC's revenue sharing

arrangement with Broker-Dealer A and the use of the CPA REITs' cash assets to pay for WPC's

obligations under the revenue sharing arrangement.

25.    In order to continue making the undisclosed broker-dealer payments, WPC also

purposefully evaded the NASD's 10 percent cap by requesting false invoices, including invoices

for "account maintenance," "field access," "due diligence," and "conference" fees. Each of these

labels was primarily a conduit for WPC to have the CPA REITs make undisclosed compensation

payments and was not a legitimate fee for services or reimbursement of actual expenses. The

total of the invoices with these false labels equaled the amount that WPC had agreed to pay

Broker-Dealer A under the revenue sharing arrangement. WPC intentionally misclassified

several of these falsely labeled invoices as payments not subject to the 10 percent cap for the

CPA REITs.

26.    The 10 percent cap is imposed by the NASD on all fees paid to broker-dealers

selling non-traded REITs ("underwriting compensation"), including to affiliated broker-dealers

acting in a wholesaling capacity, such as CF. Underwriting compensation includes all items of

compensation paid, directly or indirectly, from whatever source, to broker-dealers that are

deemed to be in connection with or related to the public offering. NASD regulations prohibit

NASD member broker-dealers from participating in any offering that exceeds the 10 percent cap.

The Commission's registration regulations require disclosure in registration statements of,

among other items, all items considered by the NASD to be underwriting compensation.

27.    By purposefully circumventing the 10 percent cap, WPC caused the CPA REITs

to pay approximately $6.4 million in additional fees and reimbursements to WPC's wholly

owned broker-dealer subsidiary, CF. CF would not have been permitted to collect and/or retain

9

these additional fees if WPC had not purposefully misclassified the fees paid under WPC's revenue sharing arrangement.

28.    The evasion of the 10 percent cap by WPC also facilitated the increased receipt of management and other fees directly and through CAM that resulted from Broker-Dealer A's continued sales of CPA REIT shares as discussed above.

### 1.    Improper Invoice Labels

29.    WPC employed four labels to make payments under the revenue sharing arrangement: "due diligence," "field access," "conference" fees, and "account maintenance." The total of the invoices with these false labels equaled the amount that WPC had agreed to pay Broker-Dealer A under the revenue sharing arrangement for a particular year, quarter, or month.

#### a.    Due Diligence

30.    NASD regulations permit an additional 0.5 percent of the gross offering proceeds to be paid for bona fide due diligence expense reimbursements above and apart from the 10 percent cap. Bona fide due diligence expenses are strictly limited to actual expenses incurred in conducting due diligence for a particular program and may not include a profit margin.

31.    The CPA REITs' registration statements and prospectuses filed with the Commission made representations concerning broker-dealer compensation in accordance with NASD regulations. For example, CPA:14's registration statements and prospectuses represented that "[t]he total underwriting compensation to be paid to [CF] and the [retail broker-dealers] in connection with [the] offering . . . cannot exceed 10% of the gross amount raised in the offering," with the exception that "an additional one-half percent of gross proceeds from sales made by [CF] and each [retail broker-dealer] may be paid for bona fide due diligence expenses."

32.    Notwithstanding the NASD requirement and the representations WPC made,

WPC, through Park and other WPC personnel, requested and/or suggested that Broker-Dealer A issue invoices labeled "due diligence" for a portion of the agreed upon amount due under WPC's revenue sharing arrangement with Broker-Dealer A. WPC did this as a way of using the CPA REITs' assets to satisfy WPC's revenue sharing arrangement with Broker-Dealer A and to circumvent the 10 percent cap limitation on broker-dealer compensation. None of these invoices were itemized and they did not reflect reimbursable bona fide due diligence expenses.

33.    Specifically, in April 2000, Park approved a six-year back-payment of "due diligence" expenses for two of the CPA REITs in spite of a lack of evidence of additional due diligence expenses connected with these payments and a total lack of itemization for the amounts invoiced. In subsequent years, Park approved for payment similar non-itemized flat fees for "due diligence" that were approximately triple the yearly amounts previously invoiced in 2000 and which, in some instances, were claimed during time periods in which no bona fide due diligence *could* have been performed because the CPA REIT offering at issue had already terminated. Fernandez participated in processing these payments.

34.    WPC caused the two CPA REITs which made the purported "due diligence" payments to Broker-Dealer A to exclude those payments from the CPA REITs' calculation of the 10 percent cap limitations.

35.    In total, WPC caused two of the CPA REITs to pay approximately $1.2 million purportedly for due diligence expenses based upon non-itemized invoices issued between 2000 and 2002.

36.    Park knew or recklessly disregarded the NASD regulations regarding the payment of bona fide due diligence expenses and their exclusion from the 10 percent cap limitation, and/or the representations made in the CPA REITs' registration statements and prospectuses

regarding due diligence payments. Park also knew or recklessly disregarded that the invoices did not reflect reimbursable bona fide due diligence expenses. Notwithstanding the foregoing, Park approved the payment of these invoices and the exclusion of these payments from the 10 percent cap.

37.    Fernandez knew or negligently disregarded the NASD regulations regarding the payment of bona fide due diligence expenses and their exclusion from the 10 percent cap limitation, and/or the representations made in the CPA REITs' registration statements and prospectuses regarding due diligence payments. Fernandez also knew or negligently disregarded that the invoices did not reflect reimbursable bona fide due diligence expenses. Notwithstanding, Fernandez participated in processing these payments and the exclusion of these payments from the 10 percent cap.

### b.    Field Access

38.    "Field access" was a term sometimes used by Broker-Dealer A to describe the level of access provided to an external product sponsor and its wholesalers – such as WPC and CF's wholesalers – to Broker-Dealer A's advisers and the ability of an external company to reimburse Broker-Dealer A's advisers for sales seminars conducted with potential investors concerning the external company's fund products.

39.    WPC through Park requested and/or accepted from Broker-Dealer A non-itemized invoices labeled "field access," when these payments were in fact used to satisfy a portion of the agreed upon amount due under WPC's revenue sharing arrangement with Broker-Dealer A. WPC did this as a means of using the CPA REITs' assets to satisfy WPC's revenue sharing arrangement with Broker-Dealer A. Fernandez participated in processing these payments and determined which CPA REIT would pay the "field access" fee.

40.     The CPA REITs' prospectuses did not disclose that this type of fee was being paid, as was required for any type of fee that was not an expense reimbursement. Notwithstanding this lack of disclosure, WPC in 2001 and 2002 caused one of the CPA REITs, CPA:14, to pay approximately $1.5 million for this purported expense, including for a time period in which CPA:14 was no longer being publicly offered.

41.     Notwithstanding payment of this purported fee, WPC and CF personnel did not receive any change in access to Broker-Dealer A's advisers. WPC and CF personnel received the same access to Broker-Dealer A's advisers prior to the payment of "field access" fees as it did while payments of a "field access" fee were made. WPC and CF personnel also continued receiving the same access to Broker-Dealer A's advisers when the "field access" fee stopped being invoiced and paid.

42.     Park knew or recklessly disregarded that the CPA REITs' prospectuses did not disclose that a "field access" fee may be paid and that a "field access" fee was not a legitimate expense reimbursement. Park also knew or recklessly disregarded that the invoices did not reflect legitimate fees owed by the CPA REIT that made the payments. Notwithstanding the foregoing, Park authorized the payment of these invoices by the CPA REIT.

43.     Fernandez knew or negligently disregarded that the CPA REITs' prospectuses did not disclose that a "field access" fee may be paid and that the invoices did not reflect legitimate fees owed by the CPA REIT which made the payments. Notwithstanding, Fernandez participated in processing these payments.

        c.     **Conference Fees**

44.     During the Relevant Period, Broker-Dealer A periodically held conferences for Broker-Dealer A's financial advisers at which external product sponsors, such as WPC, could

13

pay set fees to have a certain number of attendees present at the conference and/or to provide
sponsorship of particular events at the conference.

45.    WPC, through Park, arranged with Broker-Dealer A to "overpay" intentionally for
certain conferences as a conduit for making payments to Broker-Dealer A that counted towards
the amount WPC owed Broker-Dealer A under the revenue sharing arrangement. WPC did this
as another means of using the CPA REITs' assets to satisfy WPC's revenue sharing arrangement
with Broker-Dealer A. No additional attendees or conference-related benefits were provided in
exchange for the amount paid in excess of the amounts due for the conference.

46.    In total, WPC caused one of the CPA REITs to make payments of approximately
$350,000 in excess of amounts due for conferences as a means of satisfying a portion of the
amount WPC had agreed to pay Broker-Dealer A under the revenue sharing arrangement.

47.    Park knew or recklessly disregarded that the payments in excess of the amounts
due for conferences were not legitimate fees owed by the CPA REIT which made the payments.
Notwithstanding the foregoing, Park authorized these payments to be made by the CPA REIT.

**d.    Account Maintenance**

48.    WPC, through Park and Fernandez, also requested and/or accepted from Broker-
Dealer A invoices labeled "account maintenance," payment of which would satisfy a portion of
the agreed upon amount due under WPC's revenue sharing arrangement with Broker-Dealer A.
None of these invoices reflected actual or estimated expenses incurred by Broker-Dealer A in
providing account maintenance services for which the CPA REITs were obligated to reimburse
Broker-Dealer A.

49.    In fact, the purported undisclosed fee for "account maintenance" was duplicative
of a separately disclosed fee that Broker-Dealer A also received that was paid and/or to be paid

by at least two of the CPA REITs, CPA:12 and CPA:15. These CPA REITs disclosed in their respective prospectuses that an "annual servicing fee" may be paid to selling broker-dealers. The stated purpose of the fee, as described in the prospectus of one of the CPA REITs was "to compensate [selling broker-dealers] for their continuing due diligence of the Company, for expenses incurred in maintaining and providing information about the Company to their representatives and their clients and for the costs incurred in maintaining [the CPA REITs'] investor accounts." According to the prospectus, the "annual servicing fee" would only be paid subject to the 10 percent cap limitation.

50.    Notwithstanding the duplicative nature of a purported "account maintenance" fee and the lack of disclosure that an additional fee may be paid, WPC used the cash assets of the CPA REITs to pay the purported "account maintenance" fees to Broker-Dealer A as a means for WPC to satisfy its obligations under the revenue sharing arrangement with Broker-Dealer A.

51.    WPC also purposefully evaded the 10 percent cap by utilizing the label "account maintenance" to cause the CPA REITs to improperly conceal and exclude the payments made from counting towards their respective 10 percent caps under the pretense that those payments were not "in connection with" an offering. Park, with assistance from Fernandez, orchestrated this concealment.

52.    For example, in mid-2002, it became apparent to Park and Fernandez that the CPA REITs' payment of purported "field access" fees could trigger a violation of the 10 percent cap because those payments were required to be included in the calculation of the cap. In October 2002, Park, with assistance from Fernandez, requested on behalf of WPC that Broker-Dealer A reissue an invoice to combine the invoiced amounts for "due diligence" and "field access" into one invoice with the label "account maintenance" in order to have the CPA REITs

exclude those payments from their 10 percent cap limitations.   In accordance with this request, Broker-Dealer A re-issued the invoice with the label "account maintenance" for the total amount due to Broker-Dealer A under WPC's revenue sharing arrangement for that period. Fernandez then processed the payments by the CPA REITs and excluded those payments from the CPA REITs' respective 10 percent cap limitations.

53.     Park knew or recklessly disregarded that the exclusion of the CPA REITs' payments of purported "account maintenance" fees from the 10 percent cap limitations of the CPA REITs was improper, and by making the payment Park caused the CPA REITs to exceed their respective 10 percent cap limitations.  Park also knew or recklessly disregarded that the invoices for purported "account maintenance" fees did not reflect legitimate expenses of the CPA REITs and/or benefits received by the CPA REITs.  Park additionally knew or recklessly disregarded that the "account maintenance" fees were not disclosed in any of the CPA REITs' offering documents.  Notwithstanding the foregoing, Park authorized the payments of purported "account maintenance" fees to be made by the CPA REITs and the exclusion of these payments from the 10 percent cap calculation.

54.     Fernandez knew or negligently disregarded that the exclusion of the CPA REITs' payments of purported "account maintenance" fees from counting towards the respective 10 percent cap limitations of the CPA REITs was improper, and Fernandez caused the CPA REITs to exceed their respective 10 percent cap limitations.  Fernandez also knew or negligently disregarded that the request to combine invoices for "field access," "due diligence," and "account maintenance" into one invoice for the combined total amount with the label "account maintenance" was improper, and that it was improper to exclude such payments from the 10 percent cap calculation.  Fernandez additionally knew or negligently disregarded that the

16

"account maintenance" fees were not disclosed in any of the CPA REITs' offering documents. Notwithstanding the foregoing, Fernandez processed the payments of purported "account maintenance" fees to be made by the CPA REITs and approved the exclusion of these payments from the 10 percent cap calculation.

55.    In late 2002, WPC, through Park, agreed to increase the amount of its revenue sharing arrangement with Broker-Dealer A to 25 basis points on all CPA REIT assets under management (the "25 bps fee"). Once again, WPC requested that Broker-Dealer A issue invoices with the label "account maintenance" for the amount due under this revised revenue sharing arrangement. WPC requested this label to circumvent the 10 percent cap limitation on compensation to broker-dealers.

56.    In October 2003, Park received a memorandum summarizing a conversation with an NASD official in which the NASD official unequivocally stated that ongoing fees similar to the 25 bps fee, even if paid for legitimate services, could not be excluded from the 10 percent cap. Notwithstanding Park's receipt of this memorandum, Park permitted and/or authorized three additional monthly invoices for the 25 bps fee to be paid by the CPA REITs and continued to exclude these payments from the CPA REITs' respective 10 percent cap calculations. In permitting and/or authorizing these three payments, Park knew or recklessly disregarded that the CPA REITs making those payments would have exceeded their respective 10 percent caps if payments of "account maintenance" fees had been included in the calculation of underwriting compensation.

57.    In total, WPC caused the CPA REITs to make payments of approximately $6.7 million for purported "account maintenance" fees as a means of satisfying the amount WPC owed to Broker-Dealer A under the revenue sharing arrangement.

58.    In early 2002, WPC also entered into a similar undisclosed revenue sharing
arrangement with a second broker-dealer ("Broker-Dealer C") concerning CPA:15, although no
payments were ultimately made under that arrangement. With the commencement of CPA:15's
offering in late 2001, WPC sought selling agreements with additional broker-dealers. WPC
obtained a selling agreement with Broker-Dealer C by agreeing to make undisclosed payments,
in addition to the disclosed fees payable to selling broker-dealers, based on Broker-Dealer C's
sales of CPA:15. Broker-Dealer C did not agree to provide any particular service in exchange
for these additional undisclosed payments. Park participated in negotiating and approving this
arrangement and knew or recklessly disregarded that Broker-Dealer C had not agreed to provide
any particular service in exchange for the additional undisclosed payments. Notwithstanding the
foregoing, in structuring the arrangement, Park utilized the label "account maintenance" for the
undisclosed additional payments and intended to exclude any payments from the 10 percent cap
calculation. Although WPC never made any payments under this agreement, Broker-Dealer C
sold over $94 million of CPA:15 shares with the understanding that these payments would be
made as agreed upon.

### 2.    Misleading Offering Documents

59.    WPC intentionally or recklessly caused the two CPA REITs which were publicly
offered during the Relevant Period, CPA:14 and CPA:15, to make material misrepresentations
and to omit to state material facts in their registration statements and prospectuses filed with the
Commission by failing to disclose WPC's revenue sharing arrangement with Broker-Dealer A
and the use of the CPA REITs' cash assets to pay for WPC's obligations under the revenue
sharing arrangement. WPC knew or recklessly disregarded that the omission of the revenue
sharing arrangement from the offering documents of the CPA REITs rendered them false and/or

misleading.

60.    In his capacity as CFO of CPA:14 and CPA:15, Park signed the registration statements and amendments thereto which omitted disclosure of the revenue sharing arrangement. Park knew or recklessly disregarded that the omission of the revenue sharing arrangement from the offering documents rendered those documents false and/or misleading.

61.    In his capacity as CAO of CPA:14 and CPA:15, Fernandez signed the registration statements and amendments thereto which omitted disclosure of the revenue sharing arrangement. Fernandez knew or negligently disregarded that the omission of the revenue sharing arrangement from the offering documents rendered those documents false and/or misleading.

### 3.    Misleading Periodic Filings

62.    WPC also caused the CPA REITs to purposefully make misleading statements in the CPA REITs' quarterly and annual reports filed with the Commission. As a result of WPC's use of the CPA REITs' cash assets to pay for WPC's obligations under WPC's revenue sharing arrangement, the expenses of the CPA REITs materially increased in certain instances. WPC caused the CPA REITs to make repeated misstatements in the Management Discussion and Analysis ("MD&A") section of the CPA REITs' quarterly and annual reports filed with the Commission by misrepresenting the source of material changes in expenses due to the undisclosed broker-dealer payments made by the CPA REITs. WPC misrepresented the undisclosed compensation as "investor-related costs" of the CPA REITs which made those payments.

63.    In fact, the expenses paid by the CPA REITs were costs that WPC had incurred in order to maintain Broker-Dealer A as a distributor for ongoing and/or future CPA REIT

19

offerings. WPC caused the CPA REITs – most of which had concluded their offering periods

years before – to pay significant portions of the undisclosed compensation that WPC had agreed

to make to Broker-Dealer A. Accordingly, the undisclosed broker-dealer payments made by the

CPA REITs were not "investor-related costs" of the CPA REITs which made those payments

and the CPA REITs did not receive any benefits in exchange for those payments.

      64.     For example, in CPA:12's Form 10-K filed with the Commission for the year

ended December 31, 2001, the MD&A section contained the following statement: "The increase

in general and administrative expense of $1,330,000 to $4,255,000 for 2001 was primarily due to

investor-related costs." However, the true source of the increase attributed to "investor-related

costs" was the payment that WPC caused CPA:12 to make in order to satisfy a portion of WPC's

financial obligations under its revenue sharing arrangement with Broker-Dealer A. Such

payment did not relate to any costs incurred with respect to investors in CPA:12, which had

ended its offering period approximately five years prior to that time. The reported increase

attributed to "investor-related costs" instead represented costs that WPC had agreed to pay to

Broker-Dealer A in order to maintain Broker-Dealer A as a distributor for new CPA REIT

offerings unrelated to CPA:12.

      65.     WPC caused the CPA REITs to repeat this misleading statement in at least sixteen

quarterly and annual reports filed with the Commission from 2001 to 2004.

      66.     Park knew or recklessly disregarded that the use of the CPA REITs' cash assets to

pay for WPC's revenue sharing arrangement caused material changes in the CPA REITs'

reported expenses in certain reporting periods. Park also knew or recklessly disregarded that the

statements attributing material changes in general and administrative expenses to "investor-

related costs" were false and/or misleading. Notwithstanding the foregoing, Park signed the

quarterly and annual reports filed with the Commission, which made these misleading statements.

67.    Fernandez knew or negligently disregarded that the use of the CPA REITs' cash assets to pay for WPC's revenue sharing arrangement caused material changes in the CPA REITs' reported expenses in certain reporting periods.  Fernandez also knew or negligently disregarded that the statements attributing material changes in general and administrative expenses to "investor-related costs" were false and/or misleading.  Notwithstanding, Fernandez signed the quarterly and annual reports filed with the Commission, which made these misleading statements.

68.    WPC also caused the CPA REITs to repeatedly fail to disclose or include the amount of the undisclosed broker-dealer payments that WPC caused the CPA REITs to pay under the rubric of "related-party transactions," as was required, in each of the Forms 10-Q, 10-K and annual proxy statements filed with the Commission by the CPA REITs which made those payments during the Relevant Period.

69.    Park knew or recklessly disregarded that the use of the CPA REITs' cash assets to pay for WPC's revenue sharing arrangement was a related party transaction.  Park also knew or recklessly disregarded that statements in the CPA REITs' quarterly and annual reports and annual proxy statements concerning related party transactions failed to disclose or otherwise include the use of the CPA REITs' cash assets to pay for WPC's revenue sharing arrangement.  Notwithstanding the foregoing, Park signed the quarterly and annual reports filed with the Commission, which also incorporated by reference the corresponding annual proxy statements, which made these misleading statements.

70.    In his capacity as CFO of the CPA REITs, Park also signed certifications from

2002 to 2004 that the quarterly and annual reports of the CPA REITs fully complied with the

requirements of Section 13(a) of the Exchange Act and that the information contained in the

reports fairly presented, in all material respects, the financial condition and results of operations

of the company. These certifications were false because the reports, by failing to disclose the

revenue sharing arrangement, did not fairly present, in all material respects, the financial

condition and results of operations of the CPA REITs.

**B.    Undisclosed Proxy Solicitation Payment**

71.    In connection with a proposed merger in 2002 between two of the CPA REITs,

CPA:10 and CIP, WPC caused those CPA REITs to make an undisclosed $100,000 payment to

Broker-Dealer B for solicitation and other services purportedly rendered in connection with the

merger. The majority of CPA:10's shareholders and a substantial percentage of CIP's

shareholders were customers of Broker-Dealer B.

72.    WPC structured the proposed merger between CPA:10 and CIP. A two-thirds

majority of shareholders of each of these entities was required to effectuate the merger, with

shareholders who did not vote considered a vote against the merger. Accordingly, approval by

the customers of Broker-Dealer B was necessary in order to obtain shareholder approval of the

merger.

73.    WPC entered into the unwritten agreement to pay Broker-Dealer B $100,000 for

solicitation and other services because WPC's senior management believed that involving

Broker-Dealer B in some capacity with the proposed merger would increase the likelihood of

investors voting in favor of the proposed merger. Park authorized the payment of $100,000 to

Broker-Dealer B and participated in drafting the proxy materials.

74.    The joint proxy statement/prospectus was filed with the Commission in

connection with the merger on Form S-4 to register the shares of CIP that would be issued if the merger was consummated. Form S-4 requires disclosure of "paid solicitors" and the anticipated cost thereof.

75.    Although the proxy materials filed with the Commission concerning the proposed merger disclosed that a different proxy solicitation agent was hired and would receive approximately $75,000 for its services, WPC caused CPA:10 and CIP to fail to disclose the agreement to pay $100,000 to Broker-Dealer B, also for solicitation services.

76.    Park knew or negligently disregarded that the payment of $100,000 to Broker-Dealer B for solicitation services was not disclosed in the proxy materials even though the proxy materials disclosed another proxy solicitation agent which received only $75,000 for its services. Notwithstanding, Park solicited proxies and/or permitted the use of his name to solicit proxies in connection with the proposed merger.

## C.    Unregistered Offering

77.    The initial offering of CPA:15 shares ("Phase I") was declared effective on November 7, 2001, and was closed to new investors in November 2002, having sold out its initial registration of forty-million shares. A registration statement for a second offering of an additional sixty-nine million shares of CPA:15 ("Phase II") was filed on October 11, 2002, and was declared effective on March 19, 2003.

78.    Throughout the period from November 2002 until March 19, 2003, CF – WPC's wholly owned broker-dealer subsidiary which acted in a wholesaling capacity for the offerings of CPA REITs – along with the network of retail distributors, continued to sell CPA:15 shares, despite knowledge that the Phase I offering had been oversold and that the Phase II registration statement was not yet effective.

79.     WPC's outside legal counsel provided incorrect legal advice to WPC that it was permissible to solicit new purchasers using a draft Phase II prospectus and to accept investor funds into CPA:15's escrow account if the funds remained in the escrow account until the Phase II registration statement became effective.

80.     As of March 18, 2003, CF and other broker-dealers sold approximately $235 million worth of CPA:15 shares to more than 8,100 investors, accounting for almost 30 percent of the total Phase II offering. WPC caused CPA:15 to pay sales commissions and marketing fees of more than $17 million to its retail distributors for those sales prior to the effective date of the registration statement.

**D.      Undisclosed Bankruptcy**

81.     Between October 1995 to February 1997, a senior executive ("Senior Executive") of WPC left his employment as an executive officer of WPC to become the CFO of a Colorado-based wireless communications equipment manufacturer ("Colorado Manufacturer"). The Senior Executive rejoined WPC in February 1997. Approximately nineteen months later, the Colorado Manufacturer filed a voluntary bankruptcy petition on September 16, 1998.

82.     Item 401(f) of Regulation S-K requires issuers to disclose in annual reports, definitive proxy statements for the election of directors, and registration statements, among other things, whether any of their officers were officers of a company that filed a petition for bankruptcy while employed with, or within two years of being employed at, the bankrupt company.

83.     In periodic questionnaires that WPC required its executive officers to answer, the Senior Executive provided the relevant information about his work experience at SCT.

84.     Notwithstanding, although each of WPC's and the CPA REITs' relevant reports

24

filed with the Commission discussed the Senior Executive's business experience as CFO of the Colorado Manufacturer, each of these filings omitted the required disclosure that the Colorado Manufacturer had filed for bankruptcy approximately nineteen months after the Senior Executive had left the Colorado Manufacturer.

**E.     False Reporting of Section 16(a) Delinquent Filings**

85.     The CPA REITs each had or have a class of securities registered under Section 12(g) of the Exchange Act.

86.     Section 16(a) of the Exchange Act requires that directors and executive officers of an issuer of any equity security registered pursuant to Section 12 of the Exchange Act file a statement with the Commission by the effective date of a registration statement filed pursuant to Section 12 of the Exchange Act, or within ten days of becoming such an officer or director, reporting the amount of all equity securities of such issuer, if any, of which they are a beneficial owner.  Section 16(a) of the Exchange Act also requires that such persons file a statement with the Commission before the end of the second business day following a change in the officer's or director's ownership of the issuer's equity securities.  Item 405 of Regulation S-K requires an issuer to review the reporting forms submitted to the issuer and to disclose the reporting violations by its officers or directors in its annual proxy statement and/or annual report on Form 10-K in a clearly marked section of the report.

87.     From approximately 1992 until mid-2003, no director or officer of any of the CPA REITs in existence during that time period which had a class of securities registered under Section 12(g) of the Exchange Act filed any of the reporting forms required pursuant to Section 16(a) of the Exchange Act.  Accordingly, all directors and officers of the CPA REITs were delinquent Section 16(a) filers during this time period.

88.    Notwithstanding the lack of any Section 16(a) reporting forms submitted by the CPA REITs' officers and directors, WPC caused the annual reports and/or annual proxy statements of the CPA REITs for the fiscal years ended 1992 through 2003 to incorrectly report that no such delinquencies existed.

### FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5])
(WPC and Park)**

89.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 88.

90.    WPC and Park, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of the CPA REITs' securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers or sellers of the CPA REITs' securities and upon other persons.

91.    The misstatements and omissions of fact detailed in paragraphs 1 through 90 hereof were material.

92.    By reason of the foregoing, WPC and Park, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**(Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)])**
**(WPC and Park)**

93.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 92.

94.    WPC and Park, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of the CPA REITs' securities, knowingly or recklessly, have employed devices, schemes and artifices to defraud.

95.    By reason of the foregoing, WPC and Park, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM FOR RELIEF

**(Violations of Sections 17(a)(2) and 17(a)(3) of the**
**Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)])**
**(WPC, Park and Fernandez)**

96.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95.

97.    WPC, Park, and Fernandez, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of the CPA REITs' securities, knowingly or negligently, have: (i) made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in acts, transactions, practices and courses of business

which operated or would have operated as a fraud or deceit upon purchasers of the CPA REITs'

securities and upon other persons.

98.    The misstatements and omissions of fact detailed in paragraphs 1 through 97

hereof were material.

99.    By reason of the foregoing, WPC, Park, and Fernandez, singly or in concert,

directly or indirectly, have violated, and unless enjoined will again violate, Sections 17(a)(2) and

17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## FOURTH CLAIM FOR RELIEF

**(Violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act
[15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, and
13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13])
(WPC)**

100.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 99.

101.    WPC, directly or indirectly, singly or in concert, by use of the means or

instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

securities exchange, in connection with the purchase or sale of the CPA REITs' securities, has

failed to file factually accurate annual and quarterly reports with the Commission concerning the

CPA REITs, and failed to provide, in addition to the information expressly required to be

included in a statement or report filed with the Commission concerning the CPA REITs, such

further material information as was necessary to make the required statements, in light of the

circumstances under which they were made, not misleading.

102.    By reason of the foregoing, WPC violated, and unless enjoined will again violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

103.    WPC failed to make and keep books, records and accounts which in reasonable detail, accurately reflected the transactions and dispositions of assets of the CPA REITs.

104.    By reason of the foregoing, WPC violated, and unless enjoined will again violate, Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## FIFTH CLAIM FOR RELIEF

**(Aiding and Abetting Violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]) (Park and Fernandez)**

105.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 104.

106.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Park and Fernandez aided and abetted WPC's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78(b)(2)(A)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], and unless enjoined will again aid and abet, violations of these provisions of the Exchange Act and the Rules thereunder. Park and Fernandez knowingly provided substantial assistance to WPC by, among other things, engaging in the conduct alleged in paragraphs 1 through 105 hereof.

## SIXTH CLAIM FOR RELIEF

**(Violations of 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]
and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])
(Park and Fernandez)**

107.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 106.

108.    In the manner described in paragraphs 1 through 107 hereof, Park and Fernandez

engaged in practices by which they each knowingly circumvented a system of internal

accounting controls and/or knowingly falsified, directly or indirectly, or caused to be falsified,

books, records and accounts of the CPA REITs that were subject to Section 13(b)(2)(A) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

109.    By reason of the foregoing, Park and Fernandez, singly or in concert, directly or

indirectly, have violated, and unless enjoined will again violate, Section 13(b)(5) of the

Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## SEVENTH CLAIM FOR RELIEF

**(Violations of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14])
(Park)**

110.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 109.

111.    In the manner described in paragraphs 1 through 110 hereof, Park, directly or

indirectly, falsely signed certifications indicating that he had personally reviewed periodic

reports containing financial statements which an issuer filed with the Commission pursuant to

Section 13(a) of the Exchange Act [15 U.S.C § 78m(a)] and that, based on his knowledge, (a)

these reports did not contain any untrue statement of material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by the report; and (b) that information contained in these reports fairly presented, in all material respects, the financial condition and results of the issuer's operations.

112.    By reason of the foregoing, Park, singly or in concert, directly or indirectly, has violated, and unless enjoined will again violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

### EIGHTH CLAIM FOR RELIEF

**(Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]
and Rule 14a-9 thereunder [17 C.F.R. § 204.14a-9])
(WPC and Park)**

113.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 112.

114.    In the manner described in paragraphs 1 through 113 hereof, WPC and Park, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, solicited or permitted the use of their names to solicit a proxy or consent or authorization in respect of the securities of the CPA REITs, which contained a statement which, at the time and in light of the circumstances under which it was made, was false or misleading with respect to a material fact, or which omitted to state a material fact necessary in order to make the statements therein not misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading, in contravention of Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

115.    By reason of the foregoing, WPC and Park, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### NINTH CLAIM FOR RELIEF

**(Violations of Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)])**
**(WPC and CF)**

116.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 115.

117.    In the manner described in paragraphs 1 through 116 hereof, WPC and CF, directly or indirectly, singly or in concert, in the absence of any applicable exemption, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, sold securities of CPA:15 through the use or medium of any prospectus or otherwise without a registration statement in effect as to CPA:15, in violation of Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)].

118.    By reason of the foregoing, WPC and CF, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)].

### PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently enjoining WPC, and its agents, servants, employees, and attorneys, and all persons in active concert or participation with it, who receive actual notice of the injunction by personal service or otherwise, and each of them, from: (a) violations of Sections 5(a) and 17(a)

of the Securities Act [15 U.S.C. §§ 77e(a) and 77q(a)]; Sections 10(b), 13(a), 13(b)(2)(A), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78n(a)]; and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, and 240.14a-9].

## II.

Permanently enjoining CF, and its agents, servants, employees, and attorneys, and all persons in active concert or participation with it, who receive actual notice of the injunction by personal service or otherwise, and each of them, from violations of Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)].

## III.

Permanently enjoining Park, and his agents, servants, employees, and attorneys, and all persons in active concert or participation with him, who receive actual notice of the injunction by personal service or otherwise, and each of them, from: (i) violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78n(a)], and Rules 10b-5, 13a-14, 13b2-1, and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.14a-9]; and (ii) aiding and abetting any violation of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## IV.

Permanently enjoining Fernandez, and his agents, servants, employees, and attorneys, and all persons in active concert or participation with him, who receive actual notice of the injunction by personal service or otherwise, and each of them, from: (i) violations of Sections

33

17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] and Section

13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §

240.13b2-1]; and (ii) aiding and abetting any violation of Sections 13(a) and 13(b)(2)(A) of the

Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1, and 13a-13

thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## V.

Ordering WPC to disgorge any and all ill-gotten gains WPC or its wholly owned

subsidiaries CAM and CF received directly or indirectly as a result of WPC's violations of the

federal securities laws, and to pay prejudgment interest on all such gains.

## VI.

Ordering WPC, Park, and Fernandez to pay civil monetary penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)].

## VII.

Barring Park from serving as an officer or director of a publicly held company pursuant

to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange

Act [15 U.S.C. § 78u(d)(2)].

## VIII.

Granting such other and further relief as the Court may deem just and proper.


Dated:  New York, New York
        March 18, 2008


Mark K. Schonfeld (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 437
New York, New York 10281
(212) 336-1020


Of Counsel:

David Rosenfeld, Esq.
David A. Markowitz, Esq.
Lee S. Bickley, Esq.
Wendy B. Griffin, Esq.
Jennifer C. Loach, Esq.